**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

BAYOU LAWN & LANDSCAPE SERVICES
489 Valparaiso Pkwy
Valparaiso, Florida 32580

CHAMBER OF COMMERCE OF THE UNITED
STATES OF AMERICA
1615 H Street, N.W.
Washington DC 20062-2000

NATIONAL HISPANIC LANDSCAPE ALLIANCE
5751 SW 58th Court
South Miami, Florida 33143

SILVICULTURAL MANAGEMENT ASSOCIATES, INC.
1915B West Main Street
Heber Springs, Arkansas

PROFESSIONAL LANDCARE NETWORK
950 Herndon Parkway, Suite 450
Herndon, Virginia 20170

FLORIDA FORESTRY ASSOCIATION
402 East Jefferson Street
Tallahassee, Florida 32301

       Plaintiffs

          v.                                     No. _____

HILDA L. SOLIS,
in her official capacity as
United States Secretary of Labor,
200 Constitution Avenue, N.W.,
Washington, DC 20210, and

JANE OATES,
in her official capacity as
United States Assistant
Secretary of Labor, Employment and Training Administration
200 Constitution Avenue, N.W.,
Washington DC 20210

                    Defendants.

COMPLAINT

1.      At issue in this case is whether an agency--the Department of Labor ("DOL")--can change a successful statutory-based program through rulemaking, when the agency acknowledges that it lacks express rulemaking authority and acknowledges that Congress has vested rulemaking authority in another agency, the Department of Homeland Security ("DHS").

2.      The H-2B Visa program is an effective and essential program providing seasonal temporary foreign workers for employment in non-agricultural positions, where unemployed United States workers ("U.S. workers") capable or willing to perform such work "cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b).  The program has worked well by providing small businesses with a reliable and legally authorized workforce necessary for many seasonal sectors, including landscaping, forestry, sea food processing, and hospitality.  On February 21, 2012, the Department of Labor issued a new rule attempting to fix a program that was not broken.  *See* 77 Fed. Reg. 10,038 (Feb. 21, 2012) ("New Rules" or "Program Rules") (attached as Exhibit 1).  The New Rules, scheduled to go into effect on April 23, 2012, impose significant added costs and additional burdens on the small business employers who rely on the H-2B program for a reliable source of workers in sectors where unemployed U.S. workers are either unavailable or unwilling to work in H-2B jobs.  The New Rules, for example, decrease the maximum number of months that an employer may employ an H-2B visa holder from ten to nine months even though for many sectors, the seasonal peakload need for work covers ten months and not nine.  Although DOL recognized that this would have an adverse effect on employers, the impact, according to DOL, "is not relevant."  77 Fed. Reg. at 10,053 (col. c); *see* 29 C.F.R. § 656.6(b) (effective April 23, 2012).

3.      The New Rules not only reduce the length of employment from ten to nine months, but also require employers to guarantee that their H-2 employees work at least seventy-five percent (75%) of the hours certified in any 12-week period and if not, pay the H-2B employees the difference for the time not worked.  *See* 29 C.F.R. § 503.16(f) (*see* 77 Fed. Reg. at 10,173).   This three-fourths guarantee will have a devastating impact on sectors with work schedules that may vary significantly because of disruptions caused by weather (*e.g.,* landscaping, forestry).

4.      The New Rules would also require H-2B employers to pay any non-H-2B employee the wages and benefits that are at least equal to those paid to its H-2B employees, if the two perform "substantially the same work," a term not defined in the rule.  *See* 20 C.F.R. §§ 655.5, 655.20.  Bringing a substantial portion of the U.S. workforce into corresponding employment where tasks may overlap, will result in an endless upward wage spiral, destroying the H-2B program.  The rule would require the employer to upwardly adjust the wage paid to its U.S. employee to take into account the benefits that the rule requires an employer to provide to its H-2B employee (*e.g.,* transportation, housing, value of three-fourths guarantee).  Once the U.S. employee's wages are adjusted upward, that will cause the H-2B wages also to increase the following season, and so on until the program dies under its own weight.

5.      The New Rules also require small business employers to pay for the roundtrip airfares and subsistence costs of their H-2B employees; DOL "estimate[d] the weighted average roundtrip travel cost per employee to be approximately $929 per H–2B worker[.]"  77 Fed. Reg. at 10,138 (col. a).  In addition, the transportation and subsistence costs of U.S. workers in corresponding employment must also be paid.  Many small

3

businesses will have difficulty making these payments, especially if they employ a significant number of H-2B visa holders.

6.      The New Rules also impose various new bureaucratic hurdles that undermine the ability of employers to obtain the admission of H-2B workers on the date they are needed and will result in economic losses as result.  The New Rules include a process, borrowed from the H-2A temporary and seasonal foreign agricultural worker program, that requires the filing of job orders, extensive domestic recruitment and an application for a temporary labor certification.  *See* 20 C.F.R. § 655.101 *et seq.* (Feb. 12, 2010).  These procedures give DOL unbridled authority to issue deficiency notices and to deny applications thereby depriving employers of essential workers or significantly delaying their arrival.  These borrowed H-2A procedures have resulted in significant economic losses in the agricultural sector since their effective date in 2010.  These adverse results will be amplified in the non-agricultural sector because of the wide variety of businesses served by the H-2B program.  Although Congress authorized DOL to issue rules for the H-2A program, it affirmatively declined to give the Secretary that same authority for the H-2B program.

7.      The New Rules will inevitably increase costs associated with hiring and retaining H-2B employees, leading to a decrease in employment of U.S. workers across the country especially in the South, including Florida.  The landscaping and related industries would be particularly hard hit.  DOL has acknowledged that the New Rules will impose added costs on these small businesses.  *See* 76 Fed. Reg. at 15,162; 77 Fed. Reg. at 10,131.  The New Rules will have similar negative effects on plaintiffs and small businesses throughout the country.  Accordingly, plaintiffs seek to enjoin temporarily, preliminarily and finally this Rule because (i) defendants lack the statutory authority to issue the New

Rules, (ii) the New Rules violate the Administrative Procedure Act ("APA") in that they lack a factual foundation, are inconsistent with governing law, inconsistent with a rule issued by the Department of Homeland Security, and are arbitrary and capricious, and (iii) the New Rules were issued without a proper analyses under the Regulatory Flexibility Act.

## I.  JURISDICTION AND VENUE

8.  This Court has subject matter jurisdiction over this action pursuant to:

  a.  28 U.S.C. § 1331, which confers original jurisdiction over all civil suits arising under the Constitution and the laws of the United States, and 28 U.S.C. § 2201 (authorizing declaratory relief), 5 U.S.C. § 601 *et seq.* (Regulatory Flexibility Act), and 5 U.S.C. § 701 *et seq.* (judicial review provisions of the Administrative Procedure Act).

  b.  Venue is proper pursuant to 28 U.S.C. § 1391(e).

## II.  PARTIES

**A.  Plaintiffs**

9.  Plaintiff Bayou Lawn & Landscape Services ("Bayou") is a family owned small landscape, irrigation and lawn maintenance business located in Valparaiso, Florida within Okaloosa County.  There are an insufficient number of U.S. employees willing to work in this occupational and geographic area and therefore, Bayou relies on temporary employees hired through the H-2B program to meet its outstanding contractual commitments.  Bayou currently employs 21 such H-2B temporary workers.  The changes the New H-2B Rules make on the program will adversely and immediately affect Bayou by driving up its costs substantially,

limiting its flexibility and imposing bureaucratic hurdles that would undermine the timeliness of approvals. The "corresponding employee" and "three-fourths guarantee" provisions will immediately and adversely affect its ability to bid successfully on new jobs by driving up its labor costs significantly; the New Rules will also imperil Bayou's ability to continue to fulfill its long-term contract obligations given its inability to pass-on these significantly higher costs to its customers. As a result, Bayou will lose customers and goodwill, or will be forced to close its doors. In either event, Bayou will be imminently and irreparably injured. Bayou is a small business within the meaning of the Small Business Act.

10. Silvicultural Management Associates, Inc. ("SMA") located in Heber Springs, Arkansas, operates under contracts with public utilities to clear brush and trees from their utility lines. The quality and timeliness of SMA's work is regulated by the Federal Energy Regulatory Commission which oversees interstate transmission lines in the United States and can impose fines of up to $1 million per day on SMA's utility customers if the lines are not appropriately clear of brush and trees. SMA depends on the H-2B program and will employ approximately 80 H-2B employees working throughout the southeast during the upcoming 2012 season. SMA's work is heavily weather dependent; workers cannot climb trees or power lines in inclement weather. The New Rules, with the three-fourths guarantee and other new requirements, will impose substantial costs; these rules do not take into account downtime due to weather and will compel SMA to pay its employees even when they do not work and when SMA is not receiving income. These new burdens will have an immediate, irreparable and adverse affect on SMA's ability to remain in business.

11.   Plaintiff National Hispanic Landscape Alliance ("NHLA") is a trade association located in South Miami, Florida, that facilitates and promotes the advancement of Hispanics as landscape industry professionals and leaders and provides Hispanic landscaping professionals a voice in the national dialogue on environmentally responsible landscape practices, and a means through which to advance the interests of their businesses, the livelihood of their employees, and the quality of life in the communities in which they live and work.  A growing number of Hispanic-Americans are becoming partners, buying firms, or starting new companies.  Today, more than half a million Hispanic-American families depend on the landscape industry for their livelihood.  NHLA members rely on foreign nonimmigrant employees under the H-2B program.  The New Rules, if implemented, will immediately and irreparably injure NHLA's members by dramatically increasing labor costs and decreasing the utility of the H-2B program, adversely affecting our members goodwill and ability to retain customers.

12.   Plaintiff Professional Landcare Network ("PLANET") is a not-for-profit membership corporation headquartered in Herndon, Virginia with more than 3,000 members.  PLANET is a small organization within the meaning of the Regulatory Flexibility Act and approximately 400 of its members use the H-2B program, most of which are small businesses as that term is defined in the Small Business Act.  PLANET and its members will be imminently and irreparably harmed if the New Rules go into effect, because those rules will make the H-2B program virtually unusable to the landscape community by dramatically driving up costs and reducing the program's ability to meet current employment needs in a timely manner.  PLANET is bringing this suit both on behalf of itself and its

non-Pennsylvania members--both large and small--that participate in the H-2B program.  PLANET commissioned a survey of its membership to ascertain the impact of the rules.  That survey revealed that more than one quarter (27%) of its membership will be adversely affected by the provision that reduces the length of employment from ten months, as is currently the case, to nine months.  The other provisions will adversely, immediately and irreparably affect an equal or greater number of PLANET's members, should they go into effect.

13.    Plaintiff Chamber of Commerce of the United States of America ("Chamber") is a not-for-profit membership corporation headquartered in Washington, D.C. and employing more than 500 individuals. The Chamber is the world's largest business federation. It represents 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. Chamber members transact business throughout the United States and a large number of countries around the world. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. The Chamber is a small organization within the meaning of the Regulatory Flexibility Act and more than 96% of its members are small businesses with 100 or fewer employees.  Based on the Chamber's experience and knowledge, many of its members rely on the H-2B program as a source of temporary seasonal labor in various sectors.  The Chamber is suing on behalf of its non-Pennsylvania members that participate in the H-2B Program.

14.    Plaintiff Florida Forestry Association ("FFA") is Florida's only statewide conservation organization which brings together those who grow and those who

use Florida's forests.  FFA has approximately 1,300 members, 400 of which are non-industrial private landowners.  Its mission is to promote the responsible use of Florida's forest resource.  Many of its members are small businesses  (site prep contractors, landowners, tree planting companies, and forest operations) that use the H-2B Program.  Among other things, H-2B workers are employed for site preparation to get the ground prepared for reforestation and by contractors for tree planting.  FFA's members that use the H-2B program will be immediately injured by DOL's new H-2B rule because it will significantly increase their costs which will threaten their ability to stay in business.

15.   Plaintiffs Chamber of Commerce of the United States of America, National Hispanic Landscape Alliance, Professional Landcare Network, and Florida Forestry Association are referred to collectively as "Plaintiff Associations."  Their small business members that participate in the H-2B Program and the small entities suing in their own right are referred to as "Plaintiff Small Businesses."  Plaintiffs suing in their own right and the members of the Plaintiff Associations participating in the H-2B Program are referred to as "Plaintiff Businesses."

16.   The new provisions will directly and imminently harm members of the Plaintiff Associations by (i) requiring payment of round-trip transportation costs, (ii) imposing a three-fourths hours guarantee, (iii) compelling corresponding employment comparability pay, (iv) reducing the period of work from ten months to nine months, and (v) adopting new bureaucratic hurdles for those seeking to participate in the program.  These changes appear to be designed more to undermine the H-2B program than to ensure that U.S. workers are not adversely affected by the employment of H-2B workers.  The New Rules will be

9

particularly devastating to small businesses that cannot easily pass-on these added costs.

**B.      Defendants**

17.    Defendant Hilda L. Solis ("Solis") is Secretary of Labor.  The Secretary of Labor is responsible for all functions of the DOL, including the Office of Foreign Labor Certification within the Employment and Training Administration, which asserts jurisdiction over the administration of the H-2B program.  Solis is sued in her official capacity; her official residence is Washington, D.C. and the New Rules issued out of Washington, D.C.

18.    Defendant Jane Oates ("Oates") is Assistant Secretary, Employment and Training Administration.  Oates issued the New Rules and is sued in her official capacity. Her official residence is Washington, D.C. and the New Rules issued out of Washington, D.C.

## III.    BACKGROUND

**Overview of H-2 Visa Program**

19.    For decades, Congress has authorized first the Attorney General and later, the Secretary of Homeland Security to issue visas to foreign workers in occupations where there is an insufficient number of United States workers.  For example, the H-1B program, which is not at issue here, authorizes the issuance of work visas for qualified foreign nationals in "specialty occupations," *e.g.,* engineering, medicine, information technology.  *See* 8 U.S.C. § 1184(i).  The H-2 visa program authorizes the issuance of visas for seasonal or temporary workers in two areas: H-2A work visas are available for temporary and seasonal agricultural workers and H-2B work visas are available for temporary non-agricultural employees.

10

20.     The H-2B program was created in 1986, by the Immigration Reform and Control Act ("IRCA") amendments to the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* ("INA").[1]   Before the creation of the separate H-2A and H-2B programs, a unified H-2 temporary foreign worker program existed for both agricultural and non-agricultural employment.  The name "H-2B" comes from the statutory provision that created the program, INA § 101(a)(15)(H)(ii)(b), codified at 8 U.S.C. § 1101(a)(15)(H)(ii)(b).  The specific purpose of the H-2B program is to provide non-agricultural employers in the United States an opportunity to hire interested foreign employees to meet the employers' temporary employment needs.

21.     Under the H-2B visa program, the Secretary of Homeland Security is authorized to admit an alien "having residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country . . . ."  8 U.S.C. § 1101(a)(15)(H)(ii)(b).

22.     To ensure that the visas are only issued for occupations and in geographic areas in the United States where United States employees cannot be found, the INA requires the Secretary of Homeland Security to make determinations about the advisability of issuing H-2B visas "after consultation with appropriate agencies of the Government upon petition of the importing employer."  8 U.S.C. § 1184(c)(1)

---

[1]     IRCA became effective in 1987, but was enacted in 1986.

23.     Under the H-2B program, DHS requires employers to apply for and receive a "Labor Certification" from DOL. Under the current regulations issued by DHS, it is expected that as part of its review process, DOL will advise DHS about whether the proposed employment would have an adverse effect in the form of wage depression on similarly employed U.S. workers.  As part of the certification process, the prospective employer is required to advertise for the position in U.S. newspapers and only if the employer fails to attract a sufficient number of U.S. workers to meet its employment requirements can its labor certification and petition be granted.  As part of the advertisement, the employer must indicate that it will pay U.S. employees the prevailing wage for the position, which is determined in advance by DOL.  This precludes wage depression.

**The 2008 H-2B Rule and Judicial Challenge**

24.     In 2008, DOL issued a new H-2B rule which did two things.  First, it codified the method used by DOL to determine the so-called prevailing wage rate (*i.e.*, Wage Rule), which is the amount that an employer must pay an H-2B employee.  *See* 73 Fed. Reg. 78,020 (Dec. 19, 2008).  Second, it revised many aspects of the H-2B program (*i.e.,* program rule).  *See id.*  On that same day, DHS issued its own H-2B program rule.  *See* 73 Fed. Reg. 78,104 (Dec. 19, 2008).

25.     The 2008 Wage Rule and certain aspects of the program rules, including DHS' definition of "temporary worker," were challenged by various plaintiffs in *Comité de Apoyo a Los Trabajadores Agrícolas v. Solis*, No. 09-240, slip op. at 38 (E.D. Pa. filed Jan. 18, 2009) ("*CATA*").  The *CATA* plaintiffs did not challenge DOL's authority to issue any rule in the first instance.  On August 31,

2010, the District Court for the Eastern District of Pennsylvania invalidated the 2008 Wage Rule on procedural grounds and also invalidated certain aspects of the program rules not relevant here.  The Court upheld DHS' definition of temporary worker and upheld the remainder of the 2008 program rules.

26.    Following Judge Pollak's August 31, 2010 ruling on the Wage Rule in *CATA*, DOL issued a new 2011 Wage Rule which is being challenged in this Court by some of the plaintiffs in this case.  *See Bayou Lawn & Landscape Servs. v. Solis*, No. 3:11-cv-0445-MCR-EMT (N.D. Fla. filed Sept. 21, 2011).

**The 2011 H-2B Proposed Program Rules**

27.    On March 18, 2011, DOL published a Notice of Proposed Rulemaking ("NPRM") in which it proposed to modify significantly the H-2B program rules that remained unaffected by Judge Pollak's decision in *CATA*.  *See* 76 Fed. Reg. 15,130 (March 18, 2011) (attached as Exhibit 2).  The NPRM sought to make major changes to the entire H-2B Program as described below.

28.    **Nine-Month Limitation**: (20 C.F.R. § 655.6(b)):  First, the NPRM sought to "define temporary need as less than 9 months," even though DHS had defined it as "one year or less." 76 Fed. Reg. at 15,138 (col. a).  *See* 8 C.F.R. § 214.2(h)(6)(ii)(B).  Defendants acknowledge that this change will have an adverse effect on some employers.  *See* 77 Fed. Reg. at l0,053 (col. c).

29.    **Three-Fourths Guarantee** (20 C.F.R. § 655.20(f); 29 C.F.R. § 503.6(f)): Second, the NRPM proposed imposing, for the first time, a so-called "guarantee."  Under this proposed rule, an employer would be required to guarantee that each H-2B employee would be offered work for at least three-

13

fourths of the number of hours requested in the labor certification over any four-week period or if not, the employer would be required to pay that employee for those hours not worked up to the guarantee. *See* 76 Fed. Reg. at 15,141 (col. c). The guarantee applied even in those sectors where businesses are at the mercy of the weather.

30. **Transportation Costs** (20 C.F.R. § 655.20(j)):    Third, the NRPM proposed requiring employers to pay the roundtrip transportation costs and subsistence (*i.e.,* room and board) for each foreign worker during travel. *See* 76 Fed. Reg. at 15,142 (col. a). Inbound travel and subsistence costs must be paid in advance.

31. **Corresponding Employee (**20 C.F.R. §§ 655.5, 655.20(f); 29 C.F.R. §§ 503.4, 503.16**)**: Fourth, the NPRM proposed extending certain H-2B requirements to U.S. workers performing so-called "corresponding work." *See* 76 Fed. Reg. at 15,161 (col. a). Thus, the wages, benefits, and transportation costs offered to an H-2B employee would have to be extended to U.S. employees performing a few overlapping tasks, even though the H-2B job duties set forth in the job order are distinct from most of the job duties performed by U.S. workers.

32. **Administrative Burdens that Will Impede or Delay Approval of Applications for Temporary Employment Certification**: In borrowing many procedures for job orders and applications for temporary employment certification from the H-2A program, the New Rules create a regulatory "bottleneck" that will lead to the same or worse delays being experienced in the H-2A program. *Compare* 20 C.F.R. §§ 655.120-655.166 (H-2A Rule) with 20 C.F.R. §§ 655.15-655.35 (New H-2B Rule). The New Rules add additional

14

impediments to prompt processing of applications by adding additional steps to the process for obtaining H-2B workers. 20 C.F.R. § 655.11-655.12.

33. In the Initial Regulatory Flexibility Act ("IRFA") analysis included in the NPRM, DOL acknowledged that it could not estimate the economic impact on small businesses of the new "corresponding employee" requirement (*see* 76 Fed. Reg. at 15,168 (col. c)) ("However, the Department has not identified a reliable source of data to estimate the number of workers in corresponding employment at work sites on which H–2B workers are requested"). It determined that roundtrip international airfare would cost employers $572 per employee and room and board another $10.64 per day per employee. *See id.* at 15,169. DOL made no effort to calculate the costs associated with the three-fourths guarantee, the nine-month definition of temporary, or the added costs associated with processing delays occasioned by additional applications procedures in the H-2B program. Instead, it concluded that the three-fourths guarantee "will impose no burden on employers that have accurately stated their need for workers." *Id.* at 15,144.

34. In addition to not calculating the costs associated with these four regulatory changes, the proposed rule presented no data justifying any of them.

35. Further, in its IRFA analysis, DOL opined that there are more than one million small businesses in the United States, but since the proposed Program Rules would only affect those 6,980 small entities that hire H-2B employees, the

Program Rules would not have a significant impact on small entities, including small businesses.[2]  Therefore, according to DOL, the RFA did not apply.

36.    On May 17, 2011, the Small Business Administration's Office of Advocacy ("SBA") submitted a letter to DOL concluding, among other things, that "DOL's Initial Regulatory Flexibility Analysis is inadequate."  SBA Letter is attached as Exhibit 3.  SBA expressed particular concern over DOL's failure to assess costs associated with corresponding employment and three-fourths guarantees, and DOL's failure to take into account the cumulative impact of its New Wage Rule and the New Program Rules.  SBA also concluded that

> DOL's analysis is incorrect because it analyzes the economic impact of the H-2B rule on over one million small businesses in five industries, when almost all of these businesses do not utilize this program.  DOL should have instead evaluated the economic impact of these regulations on the 6,980 small entities that DOL estimates actually utilize the H-2B program.  Exhibit 3 at 4.

37.    The Chamber and PLANET also filed comments with DOL, each noting the lack of data underlying the rule, the inadequacy of the IRFA analysis, and the rules' adverse effect on small businesses.  *See* Exhibits 4 and 5, respectively.  The Chamber, for instance, noted that the "corresponding employment" requirement "turned workforce development principles on their head," by requiring "identical wages to workers who do not perform the same or similar functions."  Chamber, Exhibit 4 at 3.  Both comments questioned the propriety or need for any of the changes in the NPRM and both indicated that the NPRM would be far more costly than calculated by DOL.

---

[2]    DOL assumes that each of the 6,980 applications resulting in an approved petition was from a unique, small business.  *See* 77 Fed. Reg. at 10,135 (col. c).

16

38.    Finally, many commenters questioned whether DOL was authorized by the INA to issue an H-2B program rule. *See* 77 Fed. Reg. at 10,043 (col. a).

**The 2012 H-2B Final Program Rules**

39.    In spite of these comments, SBA's views, and the acknowledged adverse effect of the proposed rule on small businesses, DOL issued the final Program Rules on February 21, 2012, adopting the proposed rules with minor changes. In the final rulemaking, DOL did not supply the economic data that it acknowledged had been missing from its analyses in the NPRM, as noted above. The Final Rules retained each of the problematic requirements delineated above. The three-fourths guarantee, now measured over 12 weeks, was retained despite data indicating that it would adversely affect a significant number of surveyed employers (*see* 77 Fed. Reg. at 10,072 (col. a)). The nine-month redefinition of temporary need, the round-trip transportation, and the corresponding employee requirements were all retained. The latter was modified slightly. Again, no hard data were offered to justify any of these regulatory changes.

40.    DOL's Final Regulatory Flexibility Act analysis was equally deficient. While DOL admitted that it had, in its IRFA analysis, significantly underestimated the cost of roundtrip international airfares by about $450 ($929 versus $572, initially posited, *see* 77 Fed. Reg. at 10,138 (col. a)), data that had been missing from IRFA analysis for the nine-month and three-quarters guarantee requirements remained absent from the Final Analysis. Even with these costs missing, DOL calculated the burden of the New Rules on employers to range from $96 million to $131 million per year. *See* Table 19, 77 Fed. Reg. at 10,131.

41. In assessing the costs of the corresponding employment guarantee, DOL did not analyze or gather any real data, because according to DOL, "pursuing a statistically valid survey would not only have been prohibitively time-consuming given the Department's time constraints, but also would have required a lengthy clearance process under the Paperwork Reduction Act." 77 Fed. Reg. at 10,134 (col. b). Thus, rather than using real data, DOL generated costs based on assumptions, none of which was supported by any data. Even so, the corresponding employment requirement was projected to cost between $17 million and $52 million per annum. *See* 77 Fed. Reg. at 10,122 (Table 4).

42. Notwithstanding these significant adverse effects, DOL did not, as required by the RFA, identify and discuss meaningful alternatives to the proposed rules, other than stating that the H-B program was voluntary and employers could opt not to participate if the conditions proved too onerous. *See* 77 Fed. Reg. at 10,144 (col. a).

43. In response to SBA's comment that DOL had incorrectly measured the effects of the New Rules against all small entities as opposed to the affected small entities, DOL did not address the two court decisions referenced by SBA which confirmed SBA's analytical framework. Instead, it repeated that its methodology was sound and that the New Rules would not adversely affect a substantial number of small entities, when measured against all small businesses in the United States, as opposed to the much smaller universe of those small entities that participate in the H-2B process. *See* 77 Fed. Reg. 10,133. DOL also noted that the "Department did not conduct its own small business surveys as an employer association suggested because doing so would

18

have required an extended clearance process under the Paperwork Reduction Act, a process that would have been impossible to fulfill given the time constraints." *Id; see* 77 Fed. Reg. at 10,134 (same).

44.    In response to comments that questioned DOL's legal authority to issue the Program Rules, DOL acknowledged that "Congress did not specifically address the issue of the Department's authority to engage in legislative rulemaking in the H–2B program . . . ." 77 Fed. Reg. at 10,043 (col. b). However, DOL argued that its authority could be inferred from the legislative history and that its views were entitled to deference. DOL did not identify any word, phrase, clause, sentence or paragraph in the INA concerning rulemaking that was ambiguous, a precondition for resort to legislative history and *Chevron*-deference.

**Effect of New Program Rules on Plaintiffs**

45.    As noted above, the Program Rules will upset the *status quo* and will imminently inflict irreparable injury on Plaintiff Businesses and Plaintiff Associations' members, the majority of which are small businesses. Plaintiff Businesses and Plaintiff Associations' members will be compelled to incur higher wage-related costs for their H-2B employees and corresponding U.S. employees effective April 23, 2012. Plaintiff Businesses and Plaintiff Associations' members operate through long-term contracts with fixed costs and keen competition precluding them from passing on these increases to their customers. Plaintiff Businesses and Plaintiff Associations' members therefore have two choices. They can terminate their H-2B employees, in which case they would have to abandon many of their contracts prematurely, losing customers and goodwill. Alternatively, they can

terminate operations altogether, in which case all customers and all goodwill would be lost. In both cases, Plaintiff Businesses and Plaintiff Associations' members would be compelled to terminate U.S. employees as they scale back operations to accommodate the economic reality imposed by the Final Program Rules.

## IV. CLAIMS

### Count I
### The Final Program Rules Exceed Defendants' Statutory Authority
### (5 U.S.C. §§ 706(2)(A), (C) & 5 U.S.C. § 558)

46. Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1 - 45, above.

47. The Administrative Procedure Act requires agencies to include "reference to the legal authority under which the rule is proposed[.]" 5 U.S.C. § 553(b)(2). Neither the proposed nor the Final Program Rules references any statute that authorizes the Secretary Labor or her delegatee to issue the Final Program Rules.

48. The required statutory reference was omitted because Congress has not authorized the Secretary of Labor to issue legislative rules affecting the H-2B visa program. Moreover, nothing in Title 29 of the United States Code grants the Secretary of Labor general rulemaking authority. Absent specific rulemaking authority in either Title 8 or Title 29 of the United States Code and absent general rulemaking authority in Title 29, the Secretary of Labor has no authority to issue these Program Rules.

49. As a result, DOL's issuance of the Final Program Rules were "in excess of . . . authority" and therefore, must be vacated.

20

**Count II**
**DOL Failed to Properly Perform a Regulatory Flexibility Analysis**
**(5 U.S.C. § 601 *et seq*.)**

50.     Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1 – 49, above.

51.     The Final Program Rules will have a significant adverse economic impact on a substantial number of small entities, including Plaintiff Small Businesses. Plaintiff Small Businesses will be compelled to spend significantly more to employ their H-2B employees as well as their regular U.S. employees or curtail operations either in part or in whole.  If the Final Program Rules were to go into effect, this would occur  immediately because Plaintiff Small Businesses cannot pass on these costs to their customers owing to the highly competitive nature of their businesses.   In the short run, Plaintiff Small Businesses would either lay off a portion of their United States workforces or their entire workforces.  Ultimately, the significantly higher costs mandated by the Program Rules during a time of extreme recession would undermine Plaintiff Small Businesses' ability to compete and thereby imperil the viability of those Plaintiffs that were able to survive over the short run.  Defendants took none of this into account when conducting their RFA.

52.     SBA has directed and the courts have consistently held that when measuring the impact of a rule on small entities, one uses as the denominator the number of small entities that would be practically affected by the rule.  Here, that would be the number of small entities that participate in the H-2B program.  DOL agrees that virtually all of those entities would be adversely affected by the new Final

Program Rules. Nevertheless, it concluded that the New Rules would not have a substantial adverse impact on a significant number of small entities because it compared the number of small entities adversely affected (about 6,890) with the total number of small entities (about 1 million), rather than with the number that could be affected by the New Rules (about 6,890). Using DOL's methodology, the New Rules would adversely affect slightly more than one percent of the small entities in the U.S. Using SBA's methodology and the one confirmed by two courts, the New Rules would adversely affect 100 percent of the relevant small entities (*i.e.*, 6,890 out of 6,890).

53. As result, the Defendants' Initial and Final RFA analyses are incorrect as a matter of law and violate the RFA.

## Count III
### The Final Program Rules are Arbitrary and Capricious
### (5 U.S.C. § 706(2)(A))

54. Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1 – 53, above.

55. The Final Program Rules are arbitrary and capricious for the reasons stated above and also because

   (a) DOL lacked rulemaking authority and therefore the Final Program Rules are inconsistent with law;

   (b) DOL's definition of "temporary" is inconsistent with the definition of that term issued by DHS, the agency with rulemaking authority;

   (c) DOL failed to provide data or other evidence to support its programmatic changes;

   (d) DOL did not provide any evidence that any of the new provisions would avoid injuring U.S. employees; and

WHEREFORE, Plaintiffs pray that the Court:

56. Enter a temporary restraining order and preliminary injunction, pending a decision on the merits, enjoining the Defendants  (i) from implementing the Final Program Rules titled "Temporary Non-Agricultural Employment of H–2B Aliens in the United States," (77 Fed. Reg. 10,038 (Feb. 21, 2012)).

57. Enter a declaratory judgment as to Counts I, and III that the DOL Final Program Rules are invalid, and enter an order vacating the Program Rules and permanently enjoining Defendants from implementing them.

58. Enter a declaratory judgment as to Count II that DOL failed to undertake the required Regulatory Flexibility Act analyses and a permanent injunction to prohibit Defendants from implementing the Program Rules otherwise giving effect to those Program Rules until such time as the head of the agency with proper rulemaking authority discharges his or her responsibilities under the Regulatory Flexibility Act to the satisfaction of the Court, and retain jurisdiction of this case to ensure compliance with the Regulatory Flexibility Act.

59. Award Plaintiffs their costs and expenses, including reasonable attorney's fees whether under the Equal Access to Justice Act or otherwise, and expert witness fees; and

60. Award such further and additional relief as is just and proper.

Respectfully submitted,

s/Robert P. Charrow _____

| | |
|---|---|
| Monte B. Lake (DC 925818)* | Robert P. Charrow (DC 261958)* |
| Wendel V. Hall (DC 439344)* | Laura Metcoff Klaus (DC 294272)* |
| C.J. LAKE LLC | Laura Reiff (DC 424579)* |
| 525 Ninth Street, N.W., Suite 800 | GREENBERG TRAURIG LLP |
| Washington, D.C. 20004 | 2101 L Street, N.W., Suite 1000 |
| Tele: 202-465-3000; Fax: 202-347-3664 | Washington, D.C. 20037 |
| Email: mlake@cj-lake.com; | Tele: 202-533-2396; Fax: 202-261-0164 |
| whall@cj-lake.com | Email: charrowr@gtlaw.com; |
| | klausl@gtlaw.com; reiffl@gtlaw.com |

Counsel for Plaintiffs

Of Counsel:

Robin S. Conrad

Rachel Bran

NATIONAL CHAMBER LITIGATION CENTER, INC.

1615 H Street, N.W.

Washington, D.C. 20062

Tele:  (202) 463-5337

Email: RConrad@USChamber.com;
       RBrand@USChamber.com

Attorneys for Plaintiff Chamber of Commerce of the
       United States of America

*Admitted to practice in the Northern District of Florida